# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MARLENE M. WILLIAMS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 09 C 7260 ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security Administration, | ) Jeffrey T. Gilbert ) Magistrate Judge ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Claimant Marlene Williams ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits. This matter is before the Court on Claimant's motion for summary judgment or remand [Dkt.#15]. Claimant argues that the Administrative Law Judge's ("ALJ") decision denying her application for disability insurance benefits should be reversed or remanded because it contains errors of law and is not supported by substantial evidence. Claimant raises the following issues: (1) whether the ALJ's residual functional capacity determination was based on substantial evidence or, rather, on prejudicial inferences and erroneous lay interpretation of medical evidence; (2) whether the ALJ's credibility determination was based on serious errors in reasoning and therefore improper; and (3) whether the ALJ failed to evaluate how Claimant's obesity would impact her residual functional capacity to sustain work. For the following reasons, Claimant's motion for summary judgment or remand is denied.

# I. BACKGROUND

## A. Procedural History

Claimant filed an application for Social Security disability insurance benefits on September 11, 2006, alleging a disability onset date of March 14, 2005. (R.15). The Social Security Administration ("SSA") denied her application on December 13, 2006. (R.66). Claimant then filed a request for reconsideration, which was denied on March 12, 2007. (R.73). Thereafter, Claimant timely filed a request for hearing. A hearing was held before Administrative Law Judge John S. Pope on May 7, 2008 at which both Claimant and a Vocational Expert testified. (R.22). On January 2, 2009, the ALJ issued his decision denying the claim for benefits. (R.13). Claimant filed a timely request for review of the ALJ's decision with the SSA's Appeals Council. (R.9). On September 4, 2009, the Appeals Council denied review, thus rendering a final administrative decision by the Commissioner. (R.5). Claimant timely filed a complaint in federal court pursuant to 42 U.S.C. § 405(g) on November 19, 2009.

## B. Personal History

Claimant was born at November 2, 1946 and was fifty-eight years old at the time of the alleged onset of disability on March 14, 2005. (R.27). Her past work includes bookkeeper, customer service for a retail furniture store from 1991 to 1997, staff assistant from 1997 to 1998, and telephone operator until May 2005. (R.31). Claimant was insured for purposes of disability insurance benefits through December 31, 2010. Claimant lost her job May 14, 2005 as the result of a reduction in force layoff. (R.29-30, 142).

## C. Medical Evidence

Claimant suffers from multiple medical impairments including a C5-C6 herniation of the cervical spine which required a fusion surgery, bilateral degenerative joint disease of her knees, bilateral carpal tunnel syndrome and obesity. (R.15). Claimant suffered a cervical spinal injury after falling at work on September 27, 2003[1], which exacerbated a pre-existing degenerative disc disease. (R.180, 276). Dr. William Payne M.D. is an orthopedic surgeon who treated Claimant and performed cervical fusion surgery on her in July 2007 as well as bilateral carpal tunnel release surgeries in October 2003 and March 2004. (R.34, 214-15). Claimant had been treated by Dr. Payne for more than five years as of the ALJ hearing. (R.34, 214-15).

As a result of her fall, Dr. Payne concluded that her injury likely exacerbated a pre-existing condition as she had a previous MRI that showed disk protrusion at the C5-C6 level. (R.203). Dr. Payne discussed surgical options with Claimant but she preferred to try epidural injections before resorting to surgery. (R.392, 397). Dr. Payne suggested epidural and physical therapy as the initial treatment. (R.203). Dr. Payne told Claimant she could return to full work duty after December 23, 2003. (R.204, 269).

Claimant was examined by Dr. Edward Goldberg M.D. on July 16, 2004 for an independent medical evaluation requested by her employer. (R.267). Claimant complained of some neck and shoulder pain. (R.269). Dr. Goldberg noted that there were X-rays of her cervical spine dated February 5, 2001 showing that Claimant had degenerative disc disease. (R.267). Dr. Goldberg released Claimant to full duty and explicitly found no limitations. (R.270).

---

[1] Claimant reported that she was walking down some stairs that were newly waxed and that she slipped and fell on her right side. (R.180).

3

A cervical MRI performed on August 23, 2005 revealed a C5-C6 osteophyte complex with significant spinal cord compression, significant neuroforaminal stenosis at that level, and spodylosis. (R.182). Dr. Dean Salehi M.D. performed an independent medical examination of Claimant on November 30, 2005 and found that the MRI showed that Claimant had C6 radiculopathy as the source of her pain. (R.182). Dr. Salehi recommended that Claimant have a anterior cervical diskectomy and fusion to decompress the spinal cord and suggested that she not work until she had surgery on her spine. (R.182). After surgery, Dr. Salehi stated that Claimant could return to work after one month if she had a desk job or three months if she had performed moderate to heavy labor. (R.182-183).

Claimant underwent a right total knee arthroplasty on March 9, 2006 and a left total knee arthroplasty surgery on June 5, 2006. (R.422-432). Following her knee surgeries, Stanley Rabinowitz M.D. examined Claimant at the request of the state agency and reviewed medical reports from Drs. Payne, Salehi, Ward, Philip Reddy and Patel. (R.284). He found that Claimant walked normally without the aid of any assistive device. (R.286). He also noted that Claimant's range of motion testing of all the joints and spine were within normal limits except for the right knee and the left knee in flexion. (R.286). He also noted that Claimant's grip in both hands was normal and her dexterity was not impaired. (R.286). Dr. Rabinowitz performed motor strength testing involving the upper extremities bilaterally and lower extremities bilaterally and found that Claimant's strength was normal and there was no evidence of atrophy. (R.287).

In December 2006 and March 2007, Richard Bilinsky M.D. and Henry Bernet M.D. reviewed Claimant's medical record on behalf of the state agency. They found that Claimant could perform work at the light level of physical exertion, noting that her gait was normal

without assistance; range of motion testing of all joints and spine was within normal limits except for the right and left knees with respect to flexion; and straight leg raising was normal. (R.289-95).

A cervical MRI performed on April 13, 2007 showed that there was a diffuse bulging disk osteophyte complex at C5-C6 resulting in bilateral neural foraminal stenosis and central canal stenosis and circumferential mild bulging disk at C5-C6 with bilateral mild neural foraminal stenosis. (R.385). After receiving multiple cervical injections, physical therapy and pharmacological treatment without success, Claimant underwent a C5-C6 spinal fusion performed by Dr. Payne on July 11, 2007. (R.247,321-335). A follow up visit on December 11, 2007 to Dr. Payne revealed that Claimant still suffered from constant pain in her neck and that there may be an area that was not completely fused. (R.386). Dr. Payne ordered a bone stimulator and physical therapy. (R.386).

## D. Hearing Testimony

### 1. Claimant's Testimony

At the time of the hearing, Claimant was sixty one years old. (R.27). She testified that the last day she worked was March 14, 2005. (R.29). She testified that she had a herniated disc from a fall she suffered while at work. (R.32). Claimant testified that while her right arm and hand has done well after surgery, she continues to experience pain in her left shoulder, arm and hand. (R.33). She testified that if she sits at a computer for more than 15 minutes, her left side hurts. (R.32). She cannot lift a gallon of milk with her left hand, but she can lift a half-gallon of milk. (R.46). Claimant testified that she could lift 15 pounds with her right hand, sit a total of six hours a day, stand a total of two hours, and walk a total of one and one-half hours. (R.20, 46-48).

Claimant also testified that she had an issue with carpal tunnel syndrome and that she had release surgeries on both hands but that she does have any more problems with carpal tunnel. (R.33, 35). Claimant testified that she had two knee replacement surgeries (R.32,3 3) and that she experiences constant sharp pain in her left knee. (R.44-45).

Claimant testified that a typical day involved getting up around 7:00 a.m., taking care of her cat and dog, taking her medication with breakfast,[2] and leaving her home about 8:30 a.m. to sit with a family member who has cancer. (R.39-40). She testified that she would make lunch for herself and two other family members, and then leave around 4:00 p.m. and stop at the store on her way home. (R.40). When she returned home, she would make dinner, watch television or crochet, and then take the dog for a short walk or visit with her neighbors before going to bed around 10:30 p.m. (R.40-41). She testified that she typically sat for only one hour at a time watching television, then moved around doing chores for five to ten minutes. (R.54). Claimant testified she did the laundry, washed and dried dishes, vacuumed in short spurts, and cut her grass with a self-propelled lawnmower. (R.42). Claimant testified that her hobbies included crocheting and craft painting. (R.42).

2. <u>Vocational Expert's Testimony</u>

William Schweihs is a Vocational Expert and testified that Claimant would be able to perform her past relevant work as a telephone operator based on a residual functional capacity to perform sedentary work, except that Claimant only occasionally could climb, balance, stoop,

---

[2] Claimant testified that she had been taking the following prescription medication: Synthroid, Verapamil, Paxil, Tylenol with Codine and Flexeril. (R.37-38, 284). Despite her constant knee pain, she testified that she is hesitant to take pain medications because of side-effects – dizziness, lightheadedness, and burred vision. (R.38). She tries not to take the muscle relaxant because it makes her sleep for 24 hours. (R.38).

6

kneel, crouch and crawl, and that Claimant frequently could reach, handle, finger, and feel with her left upper extremity. (R.60). However, he testified that Claimant would be unable to perform any past relevant work if her ability to reach, handle, finger and feel with her upper left extremity was reduced to only occasionally. (R.61). The Vocational Expert also testified that if Claimant's left arm and knee pain required her to get up and move around for five or ten minutes after every hour of sitting, she could not perform and sustain her duties as a telephone operator, nor any other sedentary work. (R.62).

### D. The ALJ's Decision

Following a hearing and a review of the medical evidence, the ALJ determined that Claimant was not disabled from her alleged onset date of March 14, 2005, upholding the denial of Claimant's application for disability insurance benefits. The ALJ reviewed Claimant's application under the appropriate five-step sequential analysis. (R.14-16). At step one, the ALJ found Claimant had not engaged in substantial gainful activity since March 14, 2005, the alleged onset date. (R.15). At step two, the ALJ found Claimant suffered from the following impairments: cervical disc disease status post C5-C6 fusion; status post bilateral total knee replacements, status post bilateral carpal tunnel release and obesity. (R.15). At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404.1520(d). (R.15).

The ALJ then considered Claimant's residual functional capacity[3] and determined that Claimant has the residual functional capacity to perform sedentary work, except that she only

---

[3] The residual functional capacity is the most that a claimant can do despite the effects of her impairments. 20 C.F.R. 404.1545(a).

7

occasionally can climb, balance, stoop, kneel, crouch and crawl and only frequently reach, handle, finger, and feel with the left upper extremity. (R.16). In assessing Claimant's residual functional capacity, the ALJ considered all of Claimant's symptoms and the extent to which the symptoms can be reasonably accepted as consistent with the objective medical evidence, medical source assessments and other evidence based on the requirement of 20 C.F.R 404.1529. (R.16-17). The ALJ also considered opinion evidence in accordance with the requirements of 20 C.F.R 404.1527. (R.16-17).

The ALJ provided a detailed description of Claimant's medical records, symptoms, daily activities and credibility. (R.16-20). The ALJ did not give full credit to Claimant's testimony because her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R.17). Specifically, the ALJ did not find Claimant's "pain so disabling as to prevent her from working." (R.19). In addition, the ALJ concluded that her "testimony that never a day passes without having severe pain is inconsistent with her activities of daily living and with her testimony that she only takes pain medication as needed and not on a daily basis." (R.19). Specifically, the ALJ noted that although Claimant testified to left knee pain and to pain in her neck and upper extremities, she cuts her grass with a self-propelled lawnmower in the summers and that, with respect to household chores, Claimant does the laundry, washes and dries dishes, and vacuums in short spurts. (R.19). Finally, the ALJ noted that while Claimant testified to "left arm and shoulder pain, her hobbies include crocheting and craft painting including the use of her hands and arms bilaterally." (R.19).

At step four, the ALJ concluded that Claimant was able to perform her past relevant work as a telephone operator and customer service clerk. (R.20). The ALJ concluded that this work did not require the performance of work-related activities precluded by Claimant's residual functional capacity. (R.20). At step five, the ALJ concluded that Claimant has not been under a disability, as defined in the Social Security Act, from March 14, 2005 through the date of his decision. (R.21).

## II. LEGAL STANDARD

### A. Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's

decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B. Disability Standard

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

Claimant argues that the ALJ's decision denying her application for disability insurance benefits should be reversed or remanded because it contains errors of law and is not supported by substantial evidence. Claimant argues that: (1) the ALJ's residual functional capacity determination was not based on substantial evidence as it was based on prejudicial inferences and erroneous "lay" interpretation of medical findings; (2) the ALJ's credibility determination was based on serious errors in reasoning and, therefore, improper; and (3) the ALJ failed to evaluate how Claimant's obesity would impact her residual functional capacity to sustain work.

### A. The ALJ Reasonably Weighed the Various Medical Opinions and Evidence.

An ALJ makes a residual functional capacity determination by weighing all the relevant evidence of record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. In doing so, he must determine what weight to give the opinions of the claimant's treating physicians. 20 C.F.R. § 404.1527. A treating physician's opinion is entitled to controlling weight if it is supported by the medical

11

findings and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Claimant argues that the ALJ failed to consider that she was not cleared by Dr. Payne to return to full duty until December 23, 2003, almost three months after her injury at work (R.269), and that the medical records showed that she had an existing degenerative disc disease even prior to 2003 and that her work-related injury only exacerbated the condition. (R.182, 203, 27). Claimant also argues that the ALJ failed to consider the fact that she underwent bilateral carpal tunnel release surgeries in March and October 2004 and was in and out of her job between the time she returned to work at the end of 2003 and being laid off on March 14, 2005.

Contrary to Claimant's assertions, the ALJ discussed the evidence that she had an existing degenerative disc disease prior to her injury and had carpal tunnel release surgeries. (R.17). But, the ALJ noted that in July 2004, less than 12 months after her fall and after both carpal tunnel surgeries, Dr. Goldstein had released her to full duty with no restrictions (R.17, 270-271). Indeed, Claimant did return to work and worked until March 2005 when she lost her job due to a workforce reduction. (R.19). Claimant then speculates that perhaps her supervisor let her work with restrictions or that she was a poor worker and cites cases discussing individuals who pushed themselves despite disabling conditions. However, Dr. Payne and Dr. Goldberg's release to full duty, coupled with the lack of any evidence to substantiate Claimant's speculation, support the ALJ's decision. (R.17, 269, 270-271).

Claimant also argues that the ALJ ignored the medical opinion by Dr. Salehi who examined her on November 30, 2005 and recommended that she not work until she had surgery. Claimant argues that Dr. Salehi's medical opinion is inconsistent with the ALJ's conclusion that

12

she had the residual functional capacity to perform her past relevant work after her disability onset date of March 15, 2005.

In assessing a disability, an ALJ "must minimally articulate [his] reasons for crediting or rejecting evidence of disability," *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992), and "build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004) (holding that "[t]he ALJ need not address every single piece of evidence in his decision, . . . but his analysis must build an accurate and logical bridge between the evidence and his findings"); *Lopez v. Barnhart*, 336 F.3d 535, 539-540 (7th Cir. 2003) (finding that an ALJ's decision must be supported by record evidence and sufficiently specific to make clear to a claimant and any subsequent reviewer what weight was given and why that weight was given).

The ALJ specifically noted in his decision that Claimant had an independent medical evaluation on November 30, 2005 at the Neurological Surgery and Spine Surgery Center. (R.17). Although the ALJ did not identify Dr. Salehi by name, it is clear that the ALJ considered his opinion, stating that "[t]he examiner strongly suggested an anterior cervical diskectomy and fusion" and "[h]e reported that after surgery the claimant should return to work after one month if she performed a desk job or three months if she performed moderate to heavy labor." (R.17).

Dr. Salehi's opinion may have corroborated Claimant's complaints about the severity of her condition but it is contradicted by the other objective medical evidence and Claimant's own testimony . In this case, Claimant's treating physicians released her to work after her fall and the state agency physicians opined that Claimant could perform light work with no limitations with

13

respect to reaching, handling, fingering, and feeling. Nine months before Claimant was laid off, Dr. Goldberg released her to "full duty" with no restrictions. (R.270-271). The ALJ further noted that "from 2005 through July 11, 2007 the claimant had only conservative treatment for her neck and back pain consisting of physical therapy and epidural injections even though a cervical diskectomy was recommended in November, 2005 by an independent medical examiner." (R.19). Even though the ALJ did not explicitly discuss Dr. Salehi's suggestion about not working before surgery, it is clear that the ALJ considered Dr. Salehi's opinion and that he did not give it great weight based on the other objective medical evidence and Claimant's own testimony.

Based on the medical evidence presented and his assessment of the testimony offered by Claimant and the VE, the ALJ did not improperly ignore Dr. Salehi's opinion and reasonably determined Claimant's residual functional capacity and concluded that she could perform her past relevant work. Because the ALJ relied upon objective medical evidence and comprehensively explained his rationale, he built a logical bridge from the medical evidence to his decision.

## B. The ALJ's Credibility Finding Was Not "Patently Wrong."

When faced with a claimant alleging subjective pain symptoms, an ALJ evaluates the credibility of a claimant's testimony about her pain. SSR 96-7p. The ALJ must consider the testimony in light of the entire record and be "sufficiently specific" as to the reasons for his credibility determination. *Id.* That said, the ALJ is in the best position to observe witnesses, and his credibility finding will not be overturned as long as it has some support in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001). An ALJ's credibility determination will be reversed only if the claimant can show it was "patently wrong." *Herr v. Sullivan*, 912 F.2d

14

178, 182 (7th Cir. 1990). "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

Here, the ALJ provided a detailed analysis of the record, including Claimant's treatment history from the date of the injury through the alleged disability onset date and subsequent treatment. (R.16-20). The ALJ specifically found that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements, concerning the intensity, persistence and limiting effects of these symptoms were not fully credible." (R.17). The ALJ recognized that Claimant had pain after her fall at work in September 2003 and noted Dr. Goldberg's July 2004 report, including his clinical findings and opinion that she could work full duty. (R.17, 270-271). Indeed, Claimant did, in fact, work until March 14, 2005 when she lost her job due to a reduction in the workforce. (R.19,30). Only after she lost her job did Claimant file for disability insurance benefits. (R.19). The ALJ noted that Claimant collected unemployment and was holding herself out as being physically able and available to work and that she actively was seeking full-time work, which was inconsistent with her allegations that her conditions prevented her from working. (R.19). Furthermore, the ALJ explained that Claimant's description of her daily activities, including household chores, cooking, washing dishes, doing laundry, walking her dog and mowing her lawn, suggested that she is not precluded from performing sedentary work. (R.20).

Claimant contends that the mere fact that she was laid off in a workforce reduction and was receiving unemployment benefits does not prove that she is not credible or that she did not suffer from disabling impairments. Claimant argues that the ALJ failed to explain how her ability

15

to do household chores would be inconsistent with her pain and resulting limitations. Claimant also argues that the ALJ completely discredited the existence and the severity of the side effects of her pain medication by mischaracterizing her testimony and the record.

The ALJ's credibility finding has support in the record and is not "patently wrong." The ALJ found Claimant's allegations regarding the effects of her condition to be not fully credible. (R.15). Subjective symptoms are difficult to verify, and the Seventh Circuit has held that an ALJ is not obliged to believe all of a claimant's testimony. *Johnson*, 449 F.3d at 805. The ALJ took into account Claimant's reported activities. *See, e.g., Jens v. Barnhardt*, 347 F.3d 209, 212-213 (7th Cir. 2003) (reported activities supported ALJ's credibility findings); 20 C.F.R.§ 404.1529(c)(3)(i). The ALJ explained that Claimant's testimony about additional limitations and significant side effects from medications[4] were inconsistent with her typical daily activities, which included getting up at 7:00 a.m., taking care of her cat ad dog, having breakfast, and leaving the house at about 8:30 a.m. to sit for seven hours watching television with a family member who was sick. While there, she would make lunch for herself and two other family members. Claimant then would leave around 4:00 p.m. and stop at the store on her way home. She would then make dinner, watch television or crochet, and then take the dog for a short walk or visit her neighbors before going to bed after the news around 10:30 p.m.

Claimant also argues that the ALJ should have credited her complaints about the side effects of her medication because the alleged side effects were consistent with the medical

---

[4] The ALJ explained that Claimant's testimony regarding her blurry vision for two or three hours a day after taking her medication is inconsistent with her testimony that she took her medication at some point after 7:00 a.m. and then within an hour and a half she drove to her sister-in-law's house. (R.20). The Court notes the Claimant's testimony reflects that she did not take her pain medication on a daily basis because of the side effects. (R.38).

16

literature. However, the issue is not whether medication could cause side effects, but whether they did so for Claimant, and to what degree. *See Schimdt*, 395 F.3d at 745 - 746. The ALJ further explained that while Claimant complained of left arm and shoulder pain, her hobbies included crocheting and craft painting and she cut her grass with a self-propelled lawnmower. Additionally, with respect to household chores, she did the laundry, washed and dried dished and vacuumed in short spurts. There was nothing unreasonable about the ALJ factoring these activities into his credibility analysis.

In light of the various factors that contributed to the ALJ's credibility determination, the Court cannot say that the judgment is "patently wrong." Therefore, the ALJ's credibility determination is upheld.

## C. The ALJ Sufficiently Articulated His Consideration of Claimant's Obesity.

Claimant further contends that the ALJ failed to evaluate how her obesity would impact her residual functional capacity to sustain work. The Seventh Circuit has characterized an ALJ's failure to explicitly discuss a claimant's obesity as harmless error when the ALJ factors obesity "indirectly" into his decision. *Prochaska v. Barnhart*, 454 F.3d 731,736-37 (7th Cir. 2006). Here, the ALJ explicitly found that Claimant was obese. (R.15, 18). The ALJ explained that, despite the state agency assessment, he was finding her limited to sedentary work because of her "body habitus." (R.19). The ALJ specifically concluded: "I find that the record reasonably supports the claimant's physical ability to perform sedentary work. In reaching my conclusion I have also considered the State agency assessment which is generally consistent with my residual functional capacity, however, considering the claimant's body habitus, I limit her to sedentary work." (R.19).

Although the ALJ may not have specifically explained how obesity affected her ability to work, the ALJ clearly considered it in making his residual functional capacity assessment. Any error in not explicitly explaining how Claimant's obesity would impact her residual functional capacity is harmless because it is clear that the ALJ factored Claimant's obesity into his decision.

## IV. CONCLUSION

For the reasons set forth in the Court's Memorandum, Opinion and Order, Claimant Marlene Williams's motion for summary judgment or remand is denied [Dkt.#15]. This is a final and appealable order.

It is ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: September 27, 2010